**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

SHIRLEY A. WORKMAN,        )    CASE NO.  1:09-cv-0822
                                   )
        Plaintiff,          )
                                   )    MAGISTRATE JUDGE VECCHIARELL
        v                  )
                                   )
MICHAEL J. ASTRUE,         )
   Commissioner of Social Security,  )    **MEMORANDUM OPINION & ORDER**
                                   )
        Defendant.

Claimant, Shirley A. Workman ("Workman"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Workman's applications for a period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 416 (i), and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act 42 U.S.C. §§ 423 and 42 U.S.C. § 1381(a).  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

### I.  Procedural History

Workman filed her applications for SSI and DIB on January 7, 2005, alleging

disability beginning August 2, 2004.  Her applications were denied initially and upon reconsideration.  Workman timely requested an administrative hearing.

Administrative Law Judge ("ALJ"), Joel Fina, held a hearing via video teleconference on January 14, 2008 at which Workman, who was represented by counsel, and Thomas Bresick, vocational expert ("VE"), testified.  The ALJ issued a decision on February 25, 2008 in which he determined that Workman was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.  Workman filed an appeal to this Court.

On appeal, Workman claims that:  1) the ALJ erred by finding Workman only partially credible; 2) the ALJ erred by failing to give proper weight to the opinion of Workman's treating physician; 3) the ALJ erred by finding Workman capable of light work; and 4) the ALJ erred by finding that Workman's impairments do not meet or equal a listed impairment.  The Commissioner disputes Workman's claims.

## II.  Evidence

### A.  Personal and Vocational Evidence

Workman was born on October 6, 1955.  Transcript ("Tr.") 66.  She was a younger individual at the time of filing and closely approaching advanced age at her hearing.  Workman left school in the 7th grade.  (Tr. 151).  She did not earn a GED.  (Tr. 151).  Workman has past relevant work as a housekeeper, kitchen helper, and housekeeping supervisor at a nursing home.  (Tr. 78).

### B.  Medical Evidence

On September 29, 2002, Workman (fka Stubbs) was taken via ambulance to Samaritan Regional Health System ("Samaritan") emergency department.  Workman

2

complained of lightheadedness, dizziness, nausea, and shortness of breath.  (Tr. 423).

Workman's EKG showed a poor R wave progression, noted as a probable normal

variant.  (Tr. 427).  A brain CT scan without contrast showed no change from a prior CT

scan performed in May 2000.  Workman was treated for a transient ischemic attack

("TIA") and discharged with instructions to follow-up with her physician.  (Tr. 432).

On October 16, 2002, a noncontrast  MRI of the brain revealed a few tiny foci of

nonspecific white matter signal alteration that may be related to small vessel ischemic

changes or demyelination.  (Tr. 420).  Carotid imaging done the same day showed

evidence of moderate stenosis involving the left internal carotid artery proximally and

stenosis involving the right internal carotid artery.  (Tr. 417).

From November 15, 2002 to November 18, 2002, Workman underwent an

ambulatory EEG as follow up to an abnormal brain MRI and complaints of palpitation,

vague confusion, lightheadedness, and shortness of breath.  (Tr. 171).  The EEG was

normal and showed no evidence for an encephalopathy or seizure disorder.  (Tr. 169).

Raymond Baddour, M.D., the ordering neurologist to whom Workman had been

referred, opined that Workman's symptoms are most likely anxiety related.  He stated

that his suspicion is low for further TIAs. (Tr. 168).

On March 4, 2003,  Workman presented to Dr. Baddour for follow-up.  Dr.

Baddour noted that Workman's symptoms resolved after initiation of Paxil CR.  (Tr.

167).

On August 5, 2003, Workman presented to Dr. Baddour for follow-up.  Workman

reported that she was doing well and had not had any further episodes of palpitation,

vague confusion, lightheadedness, or shortness of breath since initiating Paxil CR.  Dr.

3

Baddour ordered a follow up carotid ultrasound and advised Workman to return for reassessment in one month.  (Tr. 166).

On August 8, 2003, Workman presented to Samaritan.  (Tr. 414).  A carotid duplex examination performed that date revealed no changes from a previous evaluation on October 16, 2002.  (Tr. 175).

On September 8, 2003, Workman presented to Dr Baddour for follow-up. Workman reported that she had three episodes of nonpositional vertigo within a 24 hour period.  She also experienced transient lightheadedness and shortness of breath. Workman had been seen in the emergency room where a CT scan was performed. Workman reported that the CT scan was unremarkable.  Dr. Baddour opined that he believed the symptoms were anxiety related, but the possibility of TIAs remains.  (Tr. 164-165).

On May 10, 2004, Workman presented to Dr. Baddour for follow-up.  Workman reported that she has not had any episodes of palpitations, vague confusion, lightheadedness, or shortness of breath in recent months, and her anxiety is well controlled.  Her August 6, 2003 carotid ultrasound revealed 1%-39% right ICA stenosis and 60%-78% left ICA stenosis.  Vertebral flow was normal bilaterally.  Workman was referred to a vascular surgeon.  (Tr. 161).

On August 24, 2004, Workman presented to Dr. Baddour for follow-up.  Workman reported recent recurrent panic attacks.  (Tr. 160).

On December 13, 2004, Workman presented to Mansfield Hospital emergency department stating that she wants to take an overdose of her medication.  (Tr. 185). Workman was admitted for observation for three days.  (Tr. 186, 194).  Workman was

4

diagnosed with major depression, recurrent, moderate; marijuana abuse, continuous; and alcohol abuse, episodic.  Her GAF score at the time of her admission was 30.[1] Workman's discharge diagnoses were major depression, recurrent, moderate; marijuana abuse, continuous; and alcohol abuse, continuous.  Her GAF score at the time of her discharge was 65.[2]  (Tr. 182).

On January 28, 2005, Workman presented to the Cleveland Clinic Wooster for an extracranial carotid artery duplex scan.  The progress notes indicate that Workman had blurred vision bilaterally intermittently for a month and a history of slurred speech and loss of balance.  The scan revealed no hemodyamically significant plaque or stenosis and bilateral extracranial carotid arteries.  The findings further revealed: 1) a mild amount of heterogenous plaque at the bilateral carotid bulbs and proximal portion of the internal carotids; 2) 0% to 29% stenosis, bilateral internal carotids; and 3) patent and integrate vertebrals bilaterally.  (Tr. 310).

On January 27, 2005, Workman presented to the Cleveland Clinic Wooster family practice complaining of neck and shoulder pain and to establish as a new patient. Workman stated that she had been to the emergency room three times in the previous

---

[1] A GAF score of between 21-30 indicates behavior that is considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or an inability to function in almost all areas.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

[2] A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.  A person who scores in this range may have a depressed mood, mild insomnia, or occasional truancy, but is generally functioning pretty well and has some meaningful interpersonal relationships. *See Diagnostic and Statistical Manual of Mental Disorders*, *supra*, at 34.

month due to pain.  Workman was referred to physical therapy for her cervical pain.

She was also referred to neurology for a cerebral vascular accident ("CVA") history and

to psychiatry for her bipolar disorder.  (Tr. 292-293).

Workman attended physical therapy from February 8, 2005 until March 11, 2005.

(Tr. 219-238).  Workman reported a 70% improvement in her symptoms.  (Tr. 219).

On February 6, 2005, Workman presented to the Wooster Community Hospital

with chest pain, cough, and shortness of breath.  Workman was diagnosed with

pneumonia and treated and released.  (Tr. 201).  Workman presented for follow-up

treatment on February 8, 2005 and February 11, 2005. The treating physician noted that

Workman may have underlying asthma, or she may be experiencing bronchio- spasm

due to infection.  (Tr. 289-291).

On February 18, 2005, Workman presented to Howard D. Shapiro, M.D., a

neurologist to whom she had been referred by Dr. Dennis Davis, her primary care

physician.  Dr. Shapiro sent a report to Dr. Davis in which he explained that it was

difficult to assess Workman accurately because she is a poor historian, and he does not

have her medical records.  Dr. Shapiro informed Dr. Davis that he was going to request

an MRI of Workman's brain so that he could determine whether there had been any

disease progression.  Dr. Shapiro also questioned how much Workman's psychological

disorder may be impacting her symptoms.  Dr. Shapiro diagnosed Workman with stroke

by history and probable bipolar disorder.  (Tr. 216-217).  On February 24, 2005,

Workman underwent a brain MRI that showed no change from her October 16, 2002

MRI.  (Tr. 218).

On March 24, 2005, Dr. Davis wrote a letter indicating that he was seeing

6

Workman for numerous medical conditions; that is, she had a history of TIAs, mitral valve prolapse, carotid occlusion, bipolar disorder, and hyperlipidemia.  He referred her to the Counseling Center for management of her psychiatric issues due to increased agitation, anxiety, and difficulty dealing with her temper.  Dr. Davis opined that due to Workman's medical conditions and symptoms, it would be very difficult for her to maintain gainful employment.  (Tr. 284).

On March 22, 2005, Workman underwent a consultive psychological examination with Robert F. Dallara, Jr. Ph.D.  Workman reported that she completed the 7th grade but was expelled in 8th grade for smoking.  She believes she attended regular classes. (Tr. 239).  She stated that she last worked 2003 doing housekeeping work.  (Tr. 242). Workman reported that she would have difficulty working because she has difficulty focusing since she had a stroke.  She believes she has had several TIAs.  Dr. Dallara noted that her speech is intelligible and spontaneous, although there were occasional circumlocutions.  Her affect is somewhat liable.  Her thinking is generally logical  but somewhat tangential at times.  Other than a slightly impaired gait, her gross motor activity is controlled and unremarkable.  She describes experiencing anxiety with shakiness and shortness of breath.  (Tr. 242).

Dr. Dallara tested Workman's intellectual functioning.  The WAIS-III suggests that Workman is functioning in the extremely low range of intelligence at the 1st percentile. She is reading at the 3.6 grade level in the 5th percentile.  (Tr. 242).  Her full scale IQ score is 65.  (Tr. 242).  Dr. Dallara noted that her scores may be a low estimate due to her poor concentration.  (Tr. 241).  Dr. Dallara did not advance the diagnosis of mental retardation because there is no evidence of onset prior to age 18.  Dr. Dallara noted the

7

possibility of bipolar disorder but did not find sufficient evidence to advance a diagnosis.

Dr. Dallara found Workman to be mildly impaired in her ability to relate to others including fellow workers and supervisors.  Her ability to understand written instructions is mildly impaired, but her ability to understand verbal instructions is adequate.  Her ability to remember and carry out simple one or two step instructions is mildly impaired as is her ability to maintain attention and concentration.  Her ability to maintain persistence and pace is not impaired.  Workman's ability to withstand the stress and pressures associated with work activity is mildly impaired.  (Tr. 243).

Dr. Dallara diagnosed Workman with cannabis abuse in self-reported remission; mood disorder, NOS; anxiety order, NOS; and borderline intellectual functioning.  He assigned her a current GAF score of 55.[3]

On March 29, 2005, state agency physician Anton Freihofner, M.D. reviewed the medical evidence.  Dr. Freihofner noted that all studies in the file were normal except for the carotid ultrasound, and there was no evidence of Workman having had a CVA.  He further noted that most symptoms were consistent with anxiety.  (Tr. 244).

On April 7, 2005, Workman presented to Dr. Davis for follow-up on her anxiety/bipolar disorder and chronic obstructive pulmonary disorder ("COPD").  Workman reported that the Zyprexa had made a profound difference in the way she is

_____

[3] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

feeling.  She is experiencing much less anxiety and is feeling better all the way around.  Her breathing is a little worse since running out of her inhaler; and she gets wheezy at night.  (Tr. 283).

On April 21, 2005, David J. Dietz, Ph. D. completed a psychiatric review technique for Workman.  (Tr. 249).  Dr. Dietz opined that Workman has mild restrictions of the activities of daily living and mild difficulties maintaining social functioning.  He further opined that she has moderate difficulties in maintaining concentration, persistence, or pace.  She has not experienced any episodes of decompensation.  (Tr. 259).

Dr. Dietz also completed a mental residual functional capacity assessment for Workman.  Dr. Deitz found Workman to be moderately limited in her ability to: 1) understand and remember detailed instructions; 2) carry out detailed instructions; and 3) accept instructions and respond appropriately to criticism from supervisors.  (Tr. 245-246).

On August 1, 2005, Dr. Davis wrote a letter indicating that Workman, who had been diagnosed with bipolar disorder with situational maladjustment disorder, anxiety, and a history of TIAs, remained under his care.  Dr. Davis stated, "Her diagnoses impair her ability to make decisions, affect her cognition and memory, as well as judgment, which would make it very difficult for her to maintain gainful employment."  (Tr. 275).

On August 18, 2005, state agency psychologist F. Casterline, Ph. D. reviewed the medical evidence and affirmed Dr. Dietz's findings.  (Tr. 247, 249).

On February 17, 2006, Workman presented to Shura Hedge. M.D. at Appleseed Community Mental Health Center ("Appleseed").  (Tr. 325).  Workman had seen Dr.

9

Hedge one year prior.  Workman reported that since previously seeing Dr. Hedge, she had entered rehabilitation in Akron.  Workman reported that she had been clean since entering rehabilitation.  Dr. Hedge diagnosed Workman with history of bipolar affective disorder, NOS; polysubstance dependence; substance induced mood disorder; and panic disorder with agoraphobia.  Dr. Hedge assigned Workman a GAF score of 61. (Tr. 326).

On April 12, 2006, Workman presented to Dr. Hedge for follow-up.  Workman reported that she was doing well.  She was compliant with her medication and did not have alcohol cravings.  (Tr. 324).  On May 11, 2006, Workman presented to Dr. Hedge for follow-up.  She reported that she had been sober for seven and one half months, and that she was doing well.  (Tr. 322).  On June 29, 2006 , Workman presented to Dr. Hedge for follow-up.  After she reported feeling somewhat overwhelmed taking care of her two grandchildren, Dr. Hedge increased her medication.  (Tr. 321).  Workman presented to Dr. Hedge for follow up on August 17, 2006 and September 14, 2006.  At both appointments, she reported doing well.  (Tr. 320, 315).  On November 2, 2006, Workman presented for follow-up with Dr. Hedge.  Workman reported that she was doing well, but had experienced a panic attack.  (Tr. 314).  On December 14, 2006, Workman presented to Dr. Hedge for follow-up.  Workman reported that she was doing well; and Dr. Hedge noted that Workman looks much better.  (Tr. 313).

On October 23, 2006, Workman underwent a brain CT scan.  The results were normal.  (Tr. 367).

On May 21, 2007, Workman presented to the Samaritan Hospital emergency department complaining of facial numbness and arm weakness.  (Tr. 441).  A brain CT

10

scan showed no acute intracranial abnormality.  (Tr. 445).  Workman was treated for

TIA and discharged.  (Tr. 448).

On June 4, 2007, Workman underwent a brain MRI that was normal except for

mild nonspecific white matter changes.  (Tr. 467).

On August 9, 2007, occupational therapist ("OT") Merry Boothroyd completed a

functional capacity evaluation of Workman.  Workman tested at sedentary levels for

activity at floor and overhead levels, and sedentary/light levels at knee, waist and

overhead levels.  Ms. Boothroyd noted Workman showed poor balance and decreased

walking tolerance.  (Tr. 491).  Workman walked slowly, but her range of motion and

strength were normal.  She was able to stand occasionally and sit constantly.  She had

some climbing and balancing problems.  (Tr. 495).

### C. Hearing Testimony

Workman testified as follows.  She has a driver's license, but does not own a car.

Her counselor drove her to the hearing.  (Tr. 602).  She completed the 7th grade, and

can read at a "minimal level".  (Tr. 602-604).  She stopped working as a hospital

housekeeper in 2005 to start her own house cleaning business.  She maintained a

house cleaning business for about one year but had to close the business because she

kept forgetting her cleaning supplies and just "couldn't keep it together." (Tr. 605-606).

She can no longer work because she takes a lot of medicine, and cannot remember

things.  The TIAs have "done something to [my] brain".  She is bipolar, has high

cholesterol, and panic attacks.  (Tr. 608-609).

Workman further testified that her daughter sometimes helps her with her

grooming.  She is not able to do many chores around the house.  (Tr. 610).  She goes

11

shopping with her daughter, uses public transportation to go to her counseling appointments, occasionally reads, and watches television.  (Tr. 610-611).

Workman cannot lift a gallon of milk with one hand, but can hold it by the handle if she puts her other hand underneath the milk.  (Tr. 612).  She is able to wash dishes, but cannot vacuum or sweep because she gets out of breath.  (Tr. 613).  She lives in a second-floor apartment.  It is difficult for her to climb the stairs.  (Tr. 614).  She has difficulty with balance and needs to hold on to things so she does not fall.  (Tr. 614-615).  She takes a number of medications.  (Tr.  615-617).

Thomas Bresick, VE, testified that Workman had previously worked as a housekeeper supervisor, a hospital cleaner/housekeeper, a personal cleaner, and a kitchen helper.  (Tr. 630, 633-634).

For his first hypothetical question, the ALJ asked the VE to assume an individual of Workman's age; with her education, work experience, and skill set; who is able to lift up to 50 pounds occasionally and 25 pounds frequently (medium work); who needs to avoid concentrated exposure to irritants and chemicals; and who is limited to simple, routine, and repetitive tasks.  (Tr. 634).  The VE testified that such an individual could perform Workman's past work as a kitchen helper.  (Tr. 634).

For his second hypothetical, the ALJ  asked the VE to assume an individual of Workman's age; with her education, work experience, and skill set; who is able to lift up to 20 pounds occasionally and 10 pounds frequently (light work); who can never climb ladders, ropes or scaffolds; who can occasionally climb ramps or stairs, balance, stoop or crouch; who can never kneel or crawl; who must avoid concentrated exposure to environmental irritants such as fumes, odors, dust, and gases; concentrated exposure

12

to chemicals and unprotected heights; and who is limited to simple, routine, and repetitive tasks.  The VE testified that such an individual could not perform any of Workman's past work.  However, she could perform work in the regional or national economy such as: electronics worker (approximately 150 jobs in the Mansfield area, 30,000 jobs in Ohio); production assembler (approximately 300 jobs in the Mansfield area, 35,000 jobs in Ohio); and small parts assembler (approximately 30 jobs in the Mansfield area, 3,000 jobs in Ohio).  (Tr. 635).

The ALJ then asked the VE to consider an individual with the same limitations set forth in the second hypothetical with the additional limitation of only occasional interaction with the public and co-workers.  (Tr. 636).  The VE testified that this additional limitation would not affect the individual's ability to perform the jobs identified in response to the second hypothetical.  (Tr. 636).

The ALJ then asked the VE to consider an individual with the same restrictions set forth in the previous hypothetical who is further limited to sedentary work, meaning she can lift up to 10 pounds occasionally.  The VE testified that she could still perform the jobs previously identified because such jobs exist at both the sedentary and light levels; however, there would be fewer jobs available at the sedentary level, *i.e.* electronics worker (approximately 100 jobs in the Mansfield area, 20,000 jobs in Ohio); production assembler (approximately 150 jobs in the Mansfield area, 23,000 jobs in Ohio).  (Tr. 637).

The VE then testified that an employee would be expected to work a full workday and workweek, with customary breaks and sick days, and that an inability to meet this expectation would preclude a person from competitive work.  (Tr. 637-638).

13

### III. Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. § 416.1100 and 20 C.F.R. § 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. § 404.1520(d) and 20 C.F.R. §416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.

14

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## IV.  Summary of Commissioner's Decision

In relevant part, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2009;

2.  The claimant has not engaged in substantial gainful activity since August 2, 2004, the alleged onset date ...;

3.  The claimant has the following severe impairments: bipolar disorder with depression; chronic obstructive pulmonary disease; history of polysubstance abuse; panic disorder with agoraphobia; status post transient ischemic attacks (TIA); and alcohol and substance abuse (cannabis) in remission by report...;

4.  The claimant does not have an impairment or combination of impairments that meets or medially equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926);

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity (RFC) to lift up to twenty pounds occasionally and lift or carry up to ten pounds frequently in light work....  Claimant cannot climb ladders, ropes, or scaffolds, kneel or crawl.  She can occasionally climb ramps or stairs, balance, stoop, and crouch.  She must avoid concentrated exposure to environmental irritants, such as fumes, odors, dusts, or gases. Claimant must avoid concentrated exposure to chemicals.  She must avoid concentrated use of moving machinery and concentrated exposure to unprotected heights.  She is limited to simple routine, repetitive tasks with only occasional interaction with the public and co-workers.

6.  The claimant is unable to perform any past relevant work (20 CFR §§ 404.1565 and 416.965);

7.  The claimant was born on October 6, 1955 and was 48 years old, which is defined as  a younger individual age 18-49, on the alleged disability onset date....  She is currently 52 years old and is considered closely approaching advanced age;

8.  The claimant has a limited education and is able to communicate in English (20 CFR §§ 404.1564 and 416.964);

9.  The claimant has no transferable skills within her maximum residual functional capacity;

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR §§ 404.1560(c) 404.1566, 416.960(c) and 416.966); and

11.  The claimant has not been under a disability, as defined in the Social Security Act, from August 2, 2004 through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g).

(Tr.15, 17-21).

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Workman claims that:  1) the ALJ erred by finding Workman only partially credible; 2) the ALJ erred by failing to give proper weight to the opinion of Workman's treating physician; 3) the ALJ erred by finding Workman capable of light work; and 4) the ALJ erred by finding that Workman's impairments did not meet or equal a listed

16

impairment.  Each of Workman's claims is without merit.

### A. The ALJ's Credibility Findings

Credibility determinations rest with the ALJ.  *Siterlet v. Secretary of Health and Human Servs.*, 823 F. 2d 918, 920 (6th Cir. 1987).  "It is for the Secretary, not a reviewing court to make credibility findings."  *Felisky v. Bowen*, 35 F. 3d 1027, 1036 (6th Cir. 1994).  However, if the ALJ finds the claimant's testimony incredible, he must articulate his reasons for so doing.  *Id.* at 1036.

In this case, the ALJ found that Workman's allegations regarding her breathing and balance problems were not entirely credible.  Specifically, the ALJ found that the medical record did not corroborate Workman's allegations regarding the degree of her limitations except during the following periods of exacerbation: 1) neurological symptoms reported in February 2005; 2) vertigo in October 2006; 3) TIA with left sided numbness in May 2007; 4) bronchitis in February 2005 and November 2007; and 5) pneumonia in January 2008.  He further noted that Workman's therapy was effective; and that she reported doing well according to the majority of therapeutic notes in 2006 and 2007.

Workman argues that the ALJ erred in finding Workman's testimony less than fully credible because the ALJ, "forgot to note that not one doctor except Dr. Dallara performed psychometric testing."  (Plaintiff' Brief on the Merits p.10).  Workman fails to articulate however, how Dr. Dallara's findings are inconsistent with the ALJ's credibility findings or with Workman's RFC.

Workman also argues that the ALJ erred in finding Workman's complaints were not consistent with the medical record because it ignored the testing done by the

17

occupational therapist ("OT") who found that Workman is incapable of moving quickly and has poor balance.  However, Workman again fails to articulate how the OT's finding is inconsistent with the Workman's RFC which provides that Workman cannot climb ladders, ropes, scaffolds, kneel or crawl; can only occasionally climb ramps or stairs, balance, stoop or crouch; must avoid concentrated use of moving machinery; and must avoid concentrated exposure to unprotected heights.

Finally, Workman argues that the ALJ erred because he failed to analyze the disabling effect of pain as required by *Duncan v. Secretary of Health and Human Servs.* *801 F. 2d 847 (6th Cir. 1986)*.  Workman's argument is erroneous because she has not alleged that she suffers from pain, nor is there any evidence that her physical or mental impairments cause her any pain.

### B. Treatment of Medical Opinions

### 1. Dr. Davis's Opinions

The medical opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner.  *Lashley v. Secretary of Health and Human Servs., 708 F.2d 1048 (6th Cir. 1983)*.  Medical opinions are statements about the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or mental restrictions.  *20 C.F.R. § 404.1527(a)(2)*.  This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record.  *20 C.F.R. §§ 404.1527(d)(3)*, 416.927(d)(3); *Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991)*; *Sizemore v. Secretary of Health and Human Services, 865 F.2d*

18

709, 711-12 (6th Cir. 1988).  Where there is insufficient objective data supporting the treating physician's opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the fact finder may choose to disregard the treating physician's opinion.  *Landsat v. Secretary of Health and Human Servs.*, 803 F.2d 211, 212 (6th Cir. 1986).  The fact finder must, however, articulate a reason for not according the opinions of a treating physician controlling weight.  *Sherman v. Heckler,* 821 F.2d 316 (6th Cir. 1987).

Workman's treating physician, Dr. Davis, provided two opinions in which he concluded that Workman would have difficulty maintaining employment.  Although it is not clear from her Brief on the Merits, it appears that Workman is arguing that the ALJ erred in rejecting Dr. Davis's conclusion regarding Workman's employability.[4]  Workman is incorrect.  The ALJ properly determined that Dr. Davis's opinions are not medical opinions within the meaning of 20 C.F.R. § 404.1527(a)(2), but rather are opinions related to the ultimate issue of disability which is reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e)(2) and 416.927(e)(2).  *See also*, Social Security Ruling 96-5p, 1996 WL 374183 * 2  ("[T]reating source opinions on issues reserved for the Commissioner are never entitled to controlling weight or special significance.").  Accordingly, the ALJ did not err in failing to accord controlling weight to Dr. Davis's opinions.

### *2. Occupational Therapist Boothroyd's Opinion*

---

[4] See Plaintiff's Brief on the Merits p. 15, "Dr. Davis wrote two letters...one...which indicated that Workman's mental limitations and physical problems would make her ability to function problematic.  And he wrote another... with a similar conclusion."

Workman also argues that the ALJ did not properly credit Boothroyd's finding that Workman tested at sedentary levels for activity at floor and overhead levels and at sedentary/light levels for knee, waist, and overhead levels.  This argument is without merit.

Only acceptable medical sources can be considered treating sources whose medical opinions may be entitled to controlling weight.  Social Security Ruling 06-03p, 2006 WL 2329939 *2.  An occupational therapist is not an acceptable medical source; and therefore, her opinion is not entitled to controlling weight.  Social Security Ruling 06-03p, 2006 WL 2329939 *2 .  However, opinions from "other" medical sources are, "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  Social Security Regulation 06-03P, 2006 WL 2329939 *3

In this case, the ALJ explicitly considered Boothroyd's opinion when he determined Workman's severe impairments (Tr. 16), and when he determined that Workman's impairments failed to meet or equal a listing.  (Tr. 18).  Moreover, although the ALJ did not discuss Boothroyd's opinion when he made his RFC determination[5], the ALJ's failure to do so is harmless error.  See *Heston v. Commissioner of Social Security*, 245 F.3d 528, 535-536 ( 6th Cir. 2001) (Failure to reference treating physician's report harmless error where ALJ's opinion supported by substantial evidence.); *Dykes v. Barnhart*, 112 Fed.Appx. 463, 468 (6th Cir. 2004) ( If refusal to even acknowledge opinion of treating physician was harmless error in *Heston*, then the ALJ's failure to discuss thoroughly opinion of consultive examiner does not warrant  reversal.)  Thus,

---

[5] As discussed in the next section, substantial evidence supports the ALJ's RFC.

20

the ALJ properly considered Boothroyd's opinion.

### C. The ALJ's RFC Determination

The ALJ determined that Workman has the residual functional capacity to perform light work, *i.e.* she can lift up to 20 pounds occasionally and lift or carry up to ten pounds frequently with the following limitations: 1) she cannot climb ladders, ropes, or scaffolds, kneel or crawl; 2) she can occasionally climb ramps or stairs, balance, stoop or crouch; 3) she must avoid concentrated exposure to environmental irritants such as fumes, odors, dusts or gases and chemicals; 4) she needs to avoid the concentrated use of moving machinery and concentrated exposure to unprotected heights.

The ALJ's determination that Workman can perform light work is supported by substantial evidence.  The ALJ noted that Workman's neurological and respiratory impairments were not as severe as Workman alleged but were limited to certain periods of exacerbation.  Specifically, the ALJ noted that Workman complained of neurological symptoms in February 2005, but Workman's February 18, 2005 examination was normal except for some difficulty walking in tandem.  In May 2007, Workman experienced a TIA; however, a brain CT scan showed no acute intracranial abnormality, and Workman was treated and released from the emergency room.  Workman underwent physical therapy for cervical pain and reported a 70% improvement after physical therapy.  Additionally, the ALJ noted that Workman's episodes of respiratory exacerbation were successfully treated.

Workman argues that her absenteeism would preclude her from employment. The only evidence supporting this argument is Dr. Davis's opinions that Workman would

have difficulty maintaining full time employment.  However, as discussed, the ALJ

properly rejected this opinion because it addresses an issue reserved to the

Commissioner.

Workman also argues that the ALJ erred in finding Workman capable of light

work because OT Boothroyd found that Workman tested at sedentary levels for activity

at floor and overhead levels and sedentary/light levels at knee, waist and overhead

levels.  As discussed, Boothroyd is not an acceptable medical source; therefore, her

opinion is not entitled to controlling weight.  The ALJ correctly considered her opinion;

but he is not required to adopt her findings, nor is he required to explicitly state the

reasons for the weight he afforded the opinion.  Social Security Ruling 06-03p, 2006 WL

2329939 *6-7.  The evidence as a whole supports the ALJ's RFC.

### D. The ALJ's Determination that Workman's Impairments Do Not Meet Or Equal A Listing

Substantial evidence supports the ALJ's finding that Workman's impairments do

not meet or equal a listed impairment.   Workman did not meet any neurological listing,

including section 11.04, due to the absence of long term deficits neurologically resulting

from abnormal brain findings.  Workman does not dispute this finding.

Regarding Workman's mental impairments, the ALJ explained that he considered

listings 12.04 (affective disorders) and 12.06 (anxiety related disorders) and found that

Workman's impairments did not meet or equal either of these listings because Workman

did not have at least two of the following: 1) marked restrictions in the activities of daily

living; 2) marked difficulties in maintaining social functioning; 3) marked difficulties in

maintaining concentration, persistence or pace; or 4) repeated episodes of

decompensation, each of an extended duration. Instead, based upon the evidence, the ALJ found that Workman had mild restrictions in the activities of daily living and social functioning; and moderate difficulties with maintaining concentration, persistence, or pace. Further, Workman did not experience any episodes of decompensation. Additionally, the ALJ found no evidence to establish the existence of the "C" criteria. Similarly, there is no evidence that Workman meets or equals listing 12.09 (substance addiction disorders). Indeed, Workman's testimony and the medical records establish continued sobriety.

Workman argues that the ALJ should have considered listing 12.05(c) (mental retardation) because Workman was assessed with an IQ score of 65. However, listing 12.05(c) requires that in addition to an IQ score of between 60 and 70, the claimant must also have a physical or mental impairment imposing additional significant work-related functional limitations. Moreover, to establish mental retardation the claimant must present evidence of, "deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22."[6] Workman has presented no such evidence and thus has failed to meet her burden. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("for a

---

[6] Listing 12.05(c) provides in part:
> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22 [with] . . . .
>
> c. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

claimant to show that his impairment matches a listing, it must meet all of the specified criteria.  An impairment that manifests only some of those criteria, no matter how severe, does not qualify."); *see also*, *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("In order to be found disabled based upon a listed impairment, the claimant must exhibit all the elements of the listing.")  Additionally, Dr. Dallara did not advance a diagnosis of mild mental retardation, but rather diagnosed Workman with borderline intellectual functioning because there was not evidence of onset prior to age 18.  Thus, the ALJ did not err in failing to address listing 12.05(c).

## VII.  Decision

For the foregoing reasons, the decision of the Commissioner is supported by substantial evidence.  Accordingly, the decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.


s/*Nancy A. Vecchiarelli*
Nancy A. Vecchiarelli
U.S. Magistrate Judge



Date: December 9, 2009

24